IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Bosal Industries-Georgia, Inc., | Case No. 3:14 CV 2635 |
| Plaintiff, | MEMORANDUM OPINION |
| -vs- | AND ORDER |
| PM Engineered Solutions, Inc., | JUDGE JACK ZOUHARY |
| Defendant. | |

## INTRODUCTION

This case features a not-uncommon dispute between two companies who enter into a manufacturing contract with good intentions that quickly soured. Why? Customer demands on the one hand, and poor communications on the other led to the collapse of their business relationship.

Plaintiff Bosal Industries-Georgia, Inc. ("Bosal") made a deal with Defendant PM Engineered Solutions, Inc. ("PMES") to purchase powered metal flanges for use in automotive exhaust systems. This lawsuit was ignited by a third party, Premium Freight Management, against both Bosal and PMES, to collect on an unpaid shipping invoice (Doc. 1). Premium Freight prevailed on summary judgment (Docs. 52 & 64). That left the principal parties to continue their fight, each pointing the finger at the other, over what went wrong. Not until after the trial and completion of post-trial briefing (Docs. 117–18) did Bosal satisfy the judgment in favor of Premium Freight (Doc. 121).

Bosal's legal claims against PMES included breach of contract, quasi contract, and indemnification (Doc. 11-1). PMES countered with breach of contract, breach of the implied covenant of good faith and fair dealing, goods sold and delivered, unjust enrichment, and violation

of the Connecticut Unfair Trade Practices Act (Doc. 28). (PMES also initially claimed tortious interference with contract against Bosal International, a related corporate entity, but it voluntarily dismissed those claims (Doc. 115 at 152) at the close of trial.)

**FINDINGS OF FACT**

**The Beginning**

Bosal is a tier 2 automotive supply company that produces exhaust systems for use in vehicles manufactured by Ford, General Motors ("GM"), and others. PMES manufactures powdered metal components, including stainless steel flanges and sensor ports (Doc. 115 at 55; Ex. 3). It has limited experience in the automotive industry (Doc. 79 at 33; Doc. 115 at 55–56). In early 2013, PMES Regional Account Manager Warren Nichols e-mailed Ken Biscupski, Bosal Purchasing Director, to inquire about potential business opportunities as a new supplier to Bosal; Biscupski responded asking for an "immediate quote" for flanges (Ex. 3). The flanges would be welded by Bosal onto exhaust pipes, then transported to DMAX, a tier 1 automotive supplier, for use in diesel engines (Doc. 111 at 92–96). The final destination was a GM truck assembly line (*id.* at 102).

**Contract Terms**

Nichols and Biscupski negotiated the contract terms (*e.g.*, Doc. 113 at 222–27; Exs. 3–5), and Bosal accepted the PMES revised quote dated February 13, 2013 (Exs. 5, 107 at 3; Doc. 113 at 225–26). PMES agreed to produce 90,000 flanges per year, or 7,500 flanges per month (plus or minus ten percent), at a price of $8.87 per flange, with exact quantities to be determined via weekly releases from Bosal (Exs. 5, 236; Doc. 111 at 57–59). The price later increased to $9.23 per flange when Bosal asked PMES to "add some packaging" (Doc. 80 at 83). The February 2013 quote provided for sixteen to eighteen weeks of lead time to allow PMES to obtain the necessary materials, prepare

machinery, develop and test production processes, address any problems, and hire and train employees (Ex. 5; Doc. 111 at 69; Doc. 113 at 106–08). The quote also identified payment terms -- "Net 60" -- and shipping terms -- "FOB Watertown," meaning Bosal was responsible for freight charges originating from the PMES plant in Watertown, Connecticut (Ex. 5; Doc. 111 at 50–51).

Bosal's usual practice in working with new suppliers was to send a Request for Quote ("RFQ") along with General Purchase Conditions ("GPC") (Doc. 111 at 37–38). The parties dispute whether this RFQ and GPC were ever sent to PMES (*see, e.g.*, *id.* at 37–42, 66, 76–78). Bosal's witnesses testified it was company policy and practice to incorporate the GPC into every contract by sending a copy to the supplier (*e.g.*, *id.* at 38–39; Doc. 112 at 144). Bosal also notes that a RFQ for a subsequent, unrelated contract between PMES and a Bosal affiliate referenced the GPC (*e.g.*, Doc. 111 at 40; Doc. 113 at 235).[1]

However, the PMES witnesses testified they never received a formal RFQ or a copy of the GPC in connection with the flange contract (*e.g.*, Doc. 113 at 233–34; Doc. 115 at 78–80), and no Bosal witness could definitively say it was sent (*see* Doc. 111 at 39, 41, 66; *see also* Doc. 116 at 4–8). Absent any testimony or documentation to the contrary, this Court finds Bosal never issued a RFQ with a GPC to PMES before signing the flange contract, and no amendment incorporating those documents was ever agreed to by PMES.

---

[1] After the formation of the flange contract but before its performance, PMES contracted with Bosal Mexico, a separate corporate entity, to produce sensor bosses (*see* Ex. 238). PMES also claims damages for unpaid invoices on this contract (Ex. 99 at 9; Doc. 115 at 99). As this Court previously determined in its evidentiary rulings, the sensor boss contract is unrelated to the flange contract at issue in this lawsuit and involved different corporate representatives on both sides (Doc. 116 at 13). The record contains insufficient evidence about this relationship, outside the scope of the flange contract, to allow this Court to make a determination regarding liability, let alone damages.

**Production Demands**

Performance of the flange contract was plagued with problems from the start. Bosal issued tooling and "blanket" production purchase orders ("POs") in late May 2013 (Exs. 7, 202), but the flange design was not finalized until June of the following year (Ex. 13). At that point, due to pressure from DMAX, Bosal insisted PMES immediately begin full production. Specifically, Bosal required (1) an initial delivery of 1,360 flanges by June 25, 2014, (2) a second delivery of 2,240 flanges by June 30, 2014, and (3) an average of 2,000 flanges per week from that point forward (Ex. 220).

*Production Ramp-Up.* The parties dispute whether the accelerated production time line interfered with the sixteen-week lead time required under the contract. The contract does not specify when the lead time was to begin (*see* Ex. 5). PMES contends lead time did not start until "print freeze," when the part specifications were finalized in June 2014 (Doc. 113 at 107–09, 178–80; Doc. 115 at 45–50). Bosal counters that lead time began when the tooling PO was issued in May 2013 (Doc. 111 at 59–60, 233). Yet Bosal's witness testimony is inconsistent on this point. For example, Anthony Lancione, Global Program Purchaser at the time of the contract, initially testified that lead time began when the tooling PO was issued (Doc. 111 at 59). But he later conceded, as confirmed by his earlier deposition testimony, that a supplier requires final part specifications before beginning lead-time activities (Doc. 111 at 68). Tim Kubiak, Bosal's Supply Quality Engineer for the flange contract, also testified that a supplier needs final specifications to begin preparing for full production (Doc. 113 at 5). This testimony -- and common sense -- favors PMES, and this Court finds the lead time began with submission of the final print on June 11, 2014 (Ex. 13).

4

Unfortunately, certain key lead-time tasks were never completed due to the rush to production. For example, Bosal did not complete its Advanced Product Quality Procedures ("APQP") before PMES entered full scale production (*e.g.*, Exs. 65, 79A–79B; Doc. 113 at 26, 161–62; Doc. 115 at 74–77). APQPs are common in the industrial manufacturing industry (Doc. 115 at 74), and Bosal intended to implement its APQP in performing this contract (Doc. 113 at 50, 104). Bosal's APQP included, among other steps, a production part approval process ("PPAP"), a run@rate exercise, a process audit, a production validation plan, and a process capability study (Ex. 65). But Bosal never approved the PMES flange PPAP (Doc. 111 at 153; Doc. 113 at 28, 33–35). Nor did it conduct a run@rate exercise (Exs. 79A–79B; Doc. 113 at 26–27) or "mass production trial," composed of a process audit, a production validation plan, and a process capability study (Doc. 115 at 65, 76). In other words, Bosal's own standard pre-production quality control procedures were short-changed to accommodate its accelerated production schedule.

To be sure, PMES objected to the elimination of lead time and ramped-up production, but it ultimately moved forward in an attempt to work with this new customer -- albeit "under duress," in the face of threats that failing to comply with Bosal's demands would lead to late fees and litigation bankrupting PMES (*e.g.*, Doc. 113 at 247–49) ("They said DMAX or GM would crush us; they would put us out of business. . . . [I]f we shut down DMAX, then they would charge us back a million dollars a day, and they would put us out of business."). Bosal agrees neither party could afford to shut down the GM assembly line (*e.g.*, Doc. 111 at 195) ("There were no threats, but I think there was probably conversation that we know we can't afford to shut GM down . . . the cost associated with it is astronomical."). Against this backdrop, Bosal contends PMES ultimately consented to the accelerated production and negotiated assistance from Bosal in complying with the new schedule (*see, e.g.*, Exs.

5

11, 22, 220; Doc. 111 at 237–38). Despite any qualms PMES may have had, it concedes it agreed to ramp up the start of production on three conditions: (1) Bosal pay the expedited freight costs for the powder; (2) Bosal pay the expenses for tearing down and setting up a new press; and (3) Bosal submit the final print specification (Ex. 220; Doc. 115 at 40–41).

*Production Rate*. In addition to moving up the start of production, Bosal also demanded PMES increase its production rate, or "throughput." The contract production rate of 7,500 flanges per month (plus or minus ten percent) translated to roughly 350 flanges per day. But this was insufficient to feed Bosal's assembly line at the rate required by DMAX -- some 450 flanges per day (*see* Ex. 219 at 3) ("Bosal is consuming 450/day and you need to get there like yesterday."). Moreover, Bosal had no "safety stock" or "bank" of extra flanges, which only added pressure to keep moving (Doc. 112 at 40–41, 50). Bosal feared any slower production would shut down the DMAX assembly line (*see* Ex. 100 at 1) ("When I run the numbers today with your rate at 300 to 400 I am going to have to calculate down time to Dmax [sic] and escalate."). At one point, Bosal and PMES were "within hours and one shift . . . of shutting down DMAX" (Doc. 112 at 69).

PMES in turn complained Bosal's production demands exceeded the contract requirements (*e.g.*, Ex. 80; Doc. 115 at 7–8). Nevertheless, PMES attempted to increase production, including running a limited second shift to address a bottleneck in the machining process (Ex. 219 at 2; Doc. 112 at 56; Doc. 115 at 52–54). Further complicating matters, when the press at the Connecticut plant failed twice, PMES subcontracted with a facility in Illinois to avoid halting production (Doc. 112 at 100, 105; Doc. 113 at 136, 148). PMES insists it never agreed to modify the flange contract, but rather was "attempting to help [its] customer" on a short-term, "best effort" basis (Doc. 115 at 117, 136; *see also* Ex. 249 at 9; Doc. 115 at 10–11, 78, 128). PMES also notes it shipped roughly 34,000

flanges to Bosal during the three and a half month period from July to early October -- a figure well in excess of its 7,500 per month contractual obligation (Ex. 103; Doc. 113 at 158).

*Quality Control*. While Bosal and PMES struggled to fill the DMAX assembly line, they also encountered a problem with the quality of some flanges. In early July 2014, a Bosal assembly line operator noticed a crack on the hub of a flange that failed a leak test (Doc. 112 at 45–47). The remaining flanges from the same production lot were visually inspected and leak tested and passed without incident (Doc. 112 at 47). The next month, the crack issue resurfaced when additional flanges failed the leak test (Doc. 112 at 56–57). Kubiak testified Bosal personnel identified thirty to forty cracked flanges during this time period, translating to a ten percent failure rate (Doc. 112 at 58–59), but only twenty cracked flanges were recorded on the Supplier Corrective Action Report ("SCAR") sent to PMES (Ex. 89 at 3). The entire shipment containing the cracked parts was isolated, and production at Bosal paused until a replacement shipment was made (Doc. 112 at 61). An August 2014 test report concluded the cracks were caused by incomplete sintering and excess sulfur (Ex. 231 at 3; Doc. 114 at 52–53).

In late September 2014, the crack issue emerged once again. This time, Bosal identified 120 cracked flanges on its SCAR report (Ex. 93 at 3). Bosal contends far more than the 140 flanges identified on its two SCAR reports were defective due to cracking, but admits it cannot identify a precise count or offer any documentation supporting a greater number of cracked flanges (*see* Ex. 107 at 2). At trial, Bosal also claimed some flanges were defective due to low density (*e.g.*, Doc. 114 at 69, 77–80). However, none of its SCAR reports identify a density problem, and Bosal did not raise this claim in its pleading (*see* Exs. 88–95; Doc. 11-1).

Shortly after the second SCAR report, Bosal instructed PMES to stop production. Bosal, PMES, and GM then engaged in a root cause analysis (Exs. 26, 224; Doc. 112 at 61; Doc. 115 at 83). Dr. John Herman, Bosal Test Manager,[2] engaged an outside lab to conduct magnaflux testing (Ex. 232; Doc. 114 at 55–61). In November and December 2014, Bosal conducted additional testing to measure the density of the flanges (Exs. 233, 234; Doc. 114 at 63). Unfortunately, the root cause analysis did not identify the cause of the cracking (Doc. 111 at 126). PMES proposed certain design modifications to strengthen the flange hub, which Bosal and DMAX rejected (*see, e.g.*, Ex. 249; Doc. 112 at 165–66, 190). Bosal last ordered flanges from PMES in October 2014, before the testing was completed (Doc. 113 at 149–50).

### The End

Meanwhile, higher-ups at Bosal and PMES argued over how to proceed with their strained business relationship. PMES contends Bosal failed to pay several past-due invoices for previously delivered flanges (Ex. 249; Doc. 115 at 87–88). PMES also rejected responsibility for expedited freight charges (Ex. 249; Doc. 112 at 162–63). In early October, PMES threatened to stop production of the flanges until these and other issues were resolved (Ex. 249; Doc. 112 at 155–56), but it never shut down the press (Doc. 112 at 175, 181; Doc. 115 at 133–35). By late September 2014, PMES was no longer willing or able to comply with Bosal's increased demands because it was falling behind in its obligations to other PMES customers (Doc. 115 at 137–38).

---

[2] At trial, Bosal attempted to qualify Dr. Herman as an expert witness on the cause of the cracking. For the reasons stated on the record -- namely, prejudice related to the tardy disclosure of Dr. Herman's opinions and some underlying lab reports -- this Court limited Dr. Herman to providing lay witness testimony and excluded the untimely produced reports (Doc. 114 at 17–25).

At the same time Bosal was pressuring PMES, Bosal was exploring its options with other suppliers (Exs. 25, 29; Doc. 112 at 139). By late September 2014, Bosal management agreed it needed to find an alternative flange source to handle some or all of the supply, fearing PMES could not keep up (*e.g.*, Ex. 52; Doc. 112 at 184). By mid October 2014, Bosal decided to terminate the contract and switch to a different supplier, but it did not inform PMES of this decision until two months later on December 12, 2014 (Ex. 97, 105, 208; Doc. 112 at 186–87; Doc. 113 at 19).

## CONCLUSIONS OF LAW

The parties dispute whether Connecticut or Michigan law applies to this action. They agree the Uniform Commercial Code ("UCC") governs the contract at issue, and they further agree that Connecticut and Michigan law is virtually identical with respect to the UCC. However, given the PMES state law claims, this Court must decide the issue. As the forum state, Ohio's choice-of-law principles guide the analysis. *See Avery Dennison Corp. v. Juhasz*, 924 F. Supp. 2d 893, 897 (N.D. Ohio 2013). Where, as here, the contract does not include a choice-of-law provision, this Court considers the factors identified in Section 188 of the Restatement (2d) of the Law of Conflicts. Those factors include (a) the place of contracting, (b) the place of negotiations of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.*

The flange contract was negotiated and formed via telephone and email between parties located in two different states. But the flanges were manufactured and delivered ("FOB Watertown") in Connecticut. This is the state with the most significant relationship to the transaction. Thus, this Court finds Connecticut law controls.

**Breach of Contract**

The parties dispute nearly every aspect of this case, which is not surprising given the over-the-top contentious discovery period (*see* Docs. 29, 36–37, 42, 54–56, 67–68, 70–71, 73). PMES asserts the contract is the February 2013 quote (Ex. 5) that was accepted by Bosal. Bosal counters that the contract was the blanket PO, plus the GPC (*see* Doc. 11-1, Ex. A). At trial, Bosal added the tooling, packaging, machining, and accelerated production POs, as well as the weekly releases and assorted emails, to its penumbra theory of the contract (*see* Doc. 118 at 2).[3] PMES has it right. The February 2013 quote satisfies the requirements for contract formation under Connecticut law: it was in writing, included the essential terms of the agreement, and was accepted by Bosal. *See* Conn. Gen. Stat. Ann. § 42a-2-201; *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 748–49 (2d Cir. 1998) ("The three irreducible requirements of § 42a-2-201 are that the writing must evidence a contract for the sale of goods; second, it must be 'signed,' a word which includes an authentication which identifies the party to be charged; and third, it must specify a quantity.") (quotation marks omitted); *see also Keefe v. Norwalk Cove Marina, Inc.*, 57 Conn. App. 601, 608 (2000) ("The essential terms of the contract, and not every single term of the contract, must be set forth therein.").

*Bosal Claims*. Bosal alleges PMES breached the flange contract by (1) failing to produce a sufficient quantity of flanges, (2) providing defective flanges, and (3) failing to pay the expedited freight charges to ship the flanges to Bosal. Under the terms of the February 2013 contract, PMES was required to produce 7,500 flanges per month, plus or minus ten percent. PMES in fact produced

---

[3] The version of the blanket PO attached to Bosal's Cross-Complaint, which included the GPC, was unsigned (*compare* Doc. 11-1, Ex. A *with* Exs. 7, 202). At trial, Bosal's counsel attempted to introduce various other unsigned, unauthenticated POs that Bosal claimed were part of the contract (Doc. 116 at 4–8). For the reasons stated on the record, this Court excluded those documents (*id.* at 7–8). *See also* Doc. 122 (Order Granting Sanctions).

over 34,000 flanges during the three and a half months from July to early October 2014 (Ex. 103). On average, this equates to over 9,000 flanges per month. Specifically, PMES produced: 8,150 flanges in July; 9,949 flanges in August; 10,483 flanges in September; and 4,023 flanges during the first two weeks of October 2014 (*id.*). These figures exceed the contract requirements.

At trial, Bosal seemed to suggest the parties modified the contract to increase the required production rate. It cited the weekly releases (Ex. 236), which required greater throughput than contemplated by the contract (Ex. 5). Those releases do not satisfy the standard for contract modification under Connecticut law. Modifying a contract requires mutual consent by both parties "to the same thing in the same sense." *Harley v. Indian Spring Land Co.*, 123 Conn. App. 800, 822 (2010). Bosal offers no evidence PMES accepted the increased throughput demands communicated in the weekly releases, which did not mention or purport to modify the contractual production rate. *Cf.* Conn. Gen. State. Ann. § 42a-2-209(3) (contract modification must comply with the statute of frauds "if the contract as modified is within its provisions"). Furthermore, Bosal's witnesses testified the releases were intended to be "consistent with PMES's February 2013 quotes that talked about 90,000 per year and 7,500 per month" (Doc. 80 at 90; *see also* Doc. 111 at 73). Various PMES personnel complained about Bosal's increased production demands (Exs. 80, 249; Doc. 115 at 7–8), and PMES witnesses insisted they did not intend to modify the contract, but rather to assist their customer -- whose customer, in turn, was apparently making surprise demands (Doc. 115 at 117, 136). Accordingly, this Court concludes the February 2013 contract was not modified by the subsequent weekly releases, and PMES satisfied its contractual obligations regarding the quantity of flanges produced.

As for the allegedly defective flanges, Bosal was unable to provide documentation to support its claims regarding the scope of the problem. Bosal was required to timely notify PMES of any breach based on the quality of the flanges. Conn. Gen. Stat. Ann. § 42a-2-607(3); *Sun Hill Indus., Inc. v. Kraftsman Grp., Inc.*, 27 Conn. App. 688, 694 (1992) ("The acceptance of nonconforming goods does not prevent the buyer from recovering damages as long as the seller was timely notified about the nonconformity."). Likewise, Bosal was required to timely notify PMES if it elected to revoke its acceptance of any flanges. Conn. Gen. Stat. Ann. § 42a-2-608; *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 122 (1976) ("Not only must there be a substantial impairment of value to the buyer, but the revocation must take place within a reasonable time after the buyer discovers or should have discovered the defect.") (quotation marks omitted).

The SCAR reports submitted to PMES identified only 140 cracked flanges (*see* Exs. 88–95). The reports identified no below-density flanges -- unsurprisingly, as the density testing was not conducted until after Bosal decided to switch flange suppliers (*see* Exs. 233–34). Of the 140 defective flanges, the cracking in the first twenty appears to be due to a machining error -- namely, incomplete sintering combined with excess levels of sulfur (Ex. 231 at 3). The root cause analysis for the remaining 120 cracked flanges was inconclusive. Bosal opted to revoke acceptance of those flanges (Ex. 93 at 3) ("Bosal is rejecting the parts but waiting for PMES' disposition to [see] if parts are to be scrapped or sent back to PMES"). Accordingly, this Court concludes Bosal timely notified PMES of either breach or revocation with respect to 140 flanges.

Finally, Bosal claims PMES is responsible for the expedited freight charges identified in Premium Freight's original Complaint (Doc. 1) in this action. Bosal contends trade usage in the auto industry requires the supplier to pay shipping costs when it causes the delay (Doc. 112 at 176–77).

But trade usage only applies when the parties are "engaged" in a given vocation or trade, or when they are otherwise aware that a given standard is "relevant" in interpreting their contract. Conn. Gen. Stat. Ann. § 42a-1-303(d). It does not apply here where the parties are not engaged in the same vocation or trade, and Bosal offered no evidence PMES was or should have been aware of the auto industry custom regarding freight charges. *See Coregis Ins. Co. v. Fleet Nat'l Bank*, 68 Conn. App. 716, 726 (2002) ("The plaintiff argues that the defendant, which is in the banking industry, should have been aware of a custom of the insurance industry. The plaintiff offers no evidentiary support for applying the usage of trade standard so broadly."); Doc. 115 at 55 (PMES had little exposure to the automotive business). Further, as discussed above, PMES satisfied the contract requirements regarding production volume. It is therefore far from clear that any expedited shipping costs were incurred due to "delay." Moreover, a contract's express terms prevail over trade usage. Conn. Gen. Stat. Ann. § 42a-1-303(e). The February 2013 flange contract stated Bosal was responsible for freight charges (Ex. 5); it did not include exceptions or other provisions for shifting that cost. Bosal remains responsible for the shipping and related costs itemized in the judgment in favor of Premium Freight (Docs. 52, 64).

*PMES Claims*. PMES contends Bosal breached the flange contract by (1) eliminating the sixteen-week lead time required by the contract and failing to complete its APQP procedures; (2) requiring more than 7,500 flanges (plus or minus ten percent) per month; (3) failing to pay for accepted flanges; and (4) wrongfully terminating the contract without notice.

The first two claims fail for the same reason. "[I]t is a settled principle of contract law that a party to an executory bilateral contract waives a material breach by the other party if he continues the business relationship, and accepts future performance without some warning that the contract is

at an end." *RBC Nice Bearings, Inc. v. SKF USA, Inc.*, 318 Conn. 737, 749 (2015). PMES concedes it agreed to move forward with the accelerated production schedule and to increase its production rate as best it could (Exs. 11, 22, 220, 249; Doc. 115 at 40–41, 117, 136). But it argues it did so under duress, in the face of financial threats from Bosal (*e.g.*, Doc. 113 at 247–49). This Court acknowledges Bosal's aggressive tactics, but it does not find Bosal improperly intimidated PMES. PMES presented no evidence that Bosal threatened any "illicit action" if PMES refused to comply with its demands, but instead warned PMES that it (and possibly DMAX or GM) would go after PMES with charge-backs or litigation (*e.g.*, Doc. 111 at 195–96). *See Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1037–38 (2d Cir. 1995) (no cognizable intimidation where party warned of future default but made no illicit threats). PMES chose to stick it out and continue production -- and, as it turns out, still faced this legal action from Bosal. Thus, PMES waived any breach by Bosal related to the elimination of lead time or increased production demands.

The remaining PMES claims are well taken. PMES informed Bosal in October 2014 that several invoices were past due. Bosal paid the invoices that were sixty days overdue at that time, in compliance with the contract's "net 60" payment terms. But Bosal has not paid the additional $133,933.91 that came due since then (Exs. 99, 249; Doc. 115 at 87–88). Bosal accepted all flanges shipped by PMES, less the 120 cracked flanges delivered in September 2014. *See* Conn. Gen. Stat. Ann. §§ 42a-2-607, 42a-2-608. Bosal breached the contract by failing to pay what it owed.

Finally, Bosal wrongfully terminated the contract when it failed to provide PMES notice of any alleged breach and an opportunity to cure. Conn. Stat. Gen. § 42a-2-607(3). The flange contract did not include a precise end date, but instead required PMES to make, and Bosal to buy, 90,000 flanges per year, plus or minus ten percent (Ex. 5). The PMES price quote was based on this figure

(*id.*) ("Pricing is based on acceptance of contracted annual quantities . . . Purchase of less than agreed upon quantities may result in a bill-back to the actual shipped-quantity price."). Bosal decided to terminate the contract and switch to another flange supplier in mid October 2014, after purchasing roughly 34,000 flanges. It provided PMES no notice of any alleged breach at that time (*see, e.g.*, Doc. 113 at 19). The only possible documented notice of breach that Bosal provided, at any time, was its SCAR reports, dated July and September 2014. But Bosal continued to order and accept additional flanges even after this point. The SCAR reports included no suggestion that Bosal intended to end its contractual relationship with PMES. *See RBC Nice Bearings*, 318 Conn. at 749.

Rather, the first notice Bosal provided to PMES of both "breach and termination" was the December 12, 2014 letter from Bosal's counsel (Ex. 105). The alleged breaches referenced in the letter are the same supply and quality issues that form the basis for Bosal's Cross-Complaint in this case, and Bosal was well aware of them throughout the life of the contract. Therefore, the December 2014 letter does not constitute reasonable notice of the alleged breach, particularly in light of the fact that Bosal had already decided to stop ordering from PMES and switch to another provider two months earlier. Without the necessary notice, Bosal wrongfully terminated the contract.

**Connecticut Unfair Trade Practices Act ("CUTPA")**

Not every breach of contract rises to the level of a CUTPA violation. To recover its attorney's fees under CUTPA, PMES must establish aggravating circumstances that "offend traditional notions of fairness." *Aztec Energy Parts., Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007) (citation omitted). Specifically, PMES must prove it (1) suffered an ascertainable loss (2) caused by (3) an unfair or deceptive trade practice. Conn. Gen. Stat. § 42-110g(a). To determine whether conduct is unfair under CUTPA, Connecticut courts apply the Federal Trade Commission's

"cigarette rule" and consider whether (1) the practice offends public policy; (2) it is immoral, unethical, oppressive, or unscrupulous; or (3) it causes substantial injury to consumers. *Ramirez v. Health Net of Northeast, Inc.*, 285 Conn. 1, 19 (2008). These criteria are disjunctive, and PMES is not required to satisfy all three to support a finding of unfairness. *Gaynor v. Hi-Tech Homes*, 149 Conn. App. 267, 275 (2014).

Admittedly, aggressive business tactics do not necessarily equal an unfair trade practice. In this case, Bosal's pattern of troubling conduct -- for example, its unilateral demands and belligerent posturing regarding the ramp-up and accelerated production -- culminated in its wrongful termination of the flange contract. This Court concludes Bosal's actions in terminating the contract rise to the level of unfair conduct. This is highlighted by the two-month delay in notifying PMES that Bosal had switched to a different flange supplier, thus allowing PMES to believe Bosal planned to fulfill the contract. Bosal's actions were clearly misleading and intentional. Because of Bosal's actions, PMES was deprived of the remaining value of the flange contract, and it was also prevented from supplementing its business with new orders from other customers.

**Other Claims**

The existence of the flange contract precludes quasi contractual claims. Accordingly, this Court does not address Bosal's claim for quasi contract or PMES' claim for unjust enrichment. *Cf. Schirmer v. Souza*, 126 Conn. App. 759, 765 (2011) ("[T]he doctrine of unjust enrichment is grounded in the theory of restitution, not in contract theory.").

**Damages**

Due to Bosal's breach of contract, PMES is entitled to damages in the amount of $132,826.31, representing outstanding accounts receivable less the value of the flanges rejected on September 29, 2014 (*see* Exs. 93, 99 at 8–9). PMES is also entitled to interest on this amount from December 19,

2014 -- the date the last invoice became due -- at the statutory rate of ten percent. Conn. Gen. Stat. Ann. § 37-3a ("interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable"); *see also Sosin v. Sosin*, 300 Conn. 205, 228–35 (2011). PMES may also recover $84,108.13 for the raw material ordered and inventory produced to fulfill releases already received by the time Bosal instructed PMES to stop production in mid October 2014 (Ex. 99; Doc. 115 at 99–100). PMES apparently did not invoice Bosal for these expenses at the time they were incurred or when it received notification of the contract termination (*see* Ex. 99); therefore, this Court awards only post-judgment interest at the statutory rate of ten percent on this amount.

PMES may not recover the cost of the additional press it purchased to keep up with Bosal's increased throughput demands. While this expense could hypothetically be recovered in a breach of contract action, PMES was unable to (1) offer sufficient evidence Bosal was aware of the purchase, and (2) provide a non-speculative calculation of its actual damages, given PMES President and CEO Craig Paullin's testimony that he could re-sell the press (perhaps at a loss) but has not done so. This Court also declines to award damages for back-up tooling and special labor costs. PMES could have negotiated these costs with Bosal when it agreed to the accelerated production time line, as it did for the expedited freight costs and press set-up/tear-down expenses, but apparently it did not do so (*see* Ex. 220; Doc. 115 at 40–41). PMES may not recover these costs now.

Finally, in light of this Court's conclusions regarding the CUTPA claims, PMES is entitled to reasonable attorney fees related to its successful claims and may submit an appropriate application with supporting documentation.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 25, 2016

17